Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
Oliver J. H. Stiefel, OSB # 135436
(503) 234-0788 │ oliver@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER, CASCADIA WILDLANDS, and OREGON WILD,** | Case No. |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, | (Environmental Matters – Violations of Federal Land Policy and Management Act; National Environmental Policy Act; Administrative Procedure Act) |
| Defendant. | |

## **NATURE OF ACTION**

1.      Plaintiffs Klamath-Siskiyou Wildlands Center ("KS Wild"), Cascadia Wildlands, and Oregon Wild (collectively "Plaintiffs") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, to the final administrative action of the Bureau of Land Management, Medford District, Grants Pass Field Office ("BLM" or "Defendant"). In issuing the Last Chance Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR") for the Last Chance Forest Management Project ("Last Chance Project" or "Project") in the Last Chance Project Area ("Project Area"), Defendant acted arbitrarily, capriciously, and contrary to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h.

2.      The DR authorized a timber sale, Paul's Payoff, on BLM-administered lands located within Douglas, Jackson, and Josephine Counties of Oregon. The DR is the first decision to implement timber sale activities contemplated in the Last Chance EA.

3.      This action seeks: 1) a declaration that the BLM violated FLPMA by authorizing a project that is inconsistent with the applicable Resource Management Plan; 2) a declaration that the BLM violated NEPA and its implementing regulations by failing to take a hard look at, and adequately disclose and consider the Project's effects on, *inter alia*, riparian reserves, invasive species proliferation, carbon storage, fire hazard and fire risk, and fish and wildlife habitat; 3) a permanent injunction prohibiting BLM from implementing the Last Chance Project until such time as it complies with the law; and 4) the vacatur and remand of the Project to the BLM for preparation of an EIS.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—2

4.      The requested relief is necessary to preserve the status quo, to prevent unlawful agency action, and to forestall irreparable injury to the environment.

5.      Should Plaintiffs prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims present a federal question. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

7.      Plaintiffs have exhausted their administrative remedies by timely participation throughout the agency's timber sale planning process. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendant has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project area is located within this judicial district. Defendant maintains an office in this judicial district.

9.      This case is properly filed in the Medford Division pursuant to Local Rule 3-2 because the vast majority of the Project Area is located within Josephine and Jackson counties, and Defendant's office where the decision was signed is located in Josephine County. The events and omissions giving rise to this claim occurred and the property that is subject to this action are primarily situated in the Medford Division.

//

//

//

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

# PARTIES

**Plaintiffs**

10.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main office is in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in commenting, monitoring, and litigation affecting public lands in Oregon. KS Wild is a membership organization and has members who would be irreparably injured by implementation of the Last Chance DR and Paul's Payoff timber sale.

11.     Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene, Oregon. Representing over 12,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members use the Project Area for a variety of professional and personal pursuits including viewing threatened and endangered species and

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—4

their habitat. Implementation of the Last Chance DR and timber sale would irreparably harm the interests of Cascadia Wildlands and its members.

12.    Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's wildlands, wildlife, and waters as an enduring legacy. Oregon Wild members use the Last Chance Project Area for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of the Last Chance DR and timber sale would irreparably harm the interests of Oregon Wild and its members.

13.    Plaintiffs have organizational interests in the proper and lawful management of the public lands managed by the Medford District BLM. Plaintiffs have actively participated in the Project's administrative process by reviewing BLM proposals and documents, conducting field exams, and submitting timely written comments regarding proposed BLM management activities.

14.    Plaintiffs and their staff and members have visited the proposed logging units numerous times over the last 18 years, including for previously proposed projects, such as the 2013 Lower Graves Project.

15.    Plaintiffs' members live in and recreate in the vicinity of the Project and have a specific interest in the rare serpentine soils and old-growth forest ecosystems surrounding Saint Paul Mountain in the Project Area. Plaintiffs' interest in the wildlife and wildlife habitat in the Project Area is longstanding, particularized, not replicable, and core to their organizational missions.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—5

16.     Plaintiffs and their members, supporters, and staff would sustain injury to their aesthetic, educational, recreational, spiritual, and scientific interests if the Last Chance Project proceeds as authorized. Plaintiffs and their members, supporters, and staff have concrete plans to return to the area where the sale is located. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the logging of old-growth forest stands located within the Last Chance Project Area.

**Defendant**

17.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is an agency within the United States Department of the Interior and is charged with managing public lands and resources in accordance and compliance with federal laws and regulations. Its Grants Pass Field Office of the Medford District issued the Last Chance EA and associated FONSI and DR authorizing the Paul's Payoff timber sale.

## LEGAL BACKGROUND

**Administrative Procedure Act (APA)**

18.     The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

19.     Upon review under the APA, a court shall "hold unlawful and set aside agency action * * * found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *." 5 U.S.C. § 706(2). Furthermore, when an agency has acted without observance of the procedure required by law, that action will be set aside. 5 U.S.C. § 706(2)(D).

**//**

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—6

**Federal Land Policy and Management Act (FLPMA)**

20.    Congress enacted the Federal Land Policy and Management Act in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq.* Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). In FLPMA, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource and archeological values." 43 U.S.C. § 1701(a)(8).

21.    FLPMA requires the BLM to develop land use plans called "resource management plans" ("RMPs") that govern the use of the land BLM manages. 43 U.S.C. § 1712. Once a resource management plan has been developed, the BLM is required to manage its lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

22.    The BLM issued the Southwestern Oregon RMP for the Medford BLM District in 2016. The final 2016 Southwestern Oregon RMP ("2016 RMP") governs the Last Chance Project and the Paul's Payoff timber sale authorized by the DR.

23.    The 2016 RMP allocates varying amounts of land to various land use categories, including late-successional reserves ("LSR"), Riparian Reserves ("RR"), and the Harvest Land Base ("HLB"). The LSRs are managed to, *inter alia*, develop, maintain, and promote northern spotted owl nesting, roosting and foraging habitat. The primary objectives for RRs are to maintain and restore riparian functions, maintain water quality, and promote the conservation and recovery of fish species listed under the Endangered Species Act ("ESA"). The HLB land

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—7

use allocation is to be managed for sustained-yield timber harvest, balanced with other applicable objectives and directives.

**National Environmental Policy Act (NEPA)**

24.     Congress enacted the National Environmental Policy Act to declare a national policy to "use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4321.

25.     To accomplish these purposes, NEPA and its implementing regulations set forth procedures designed to (1) ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions, and (2) foster meaningful public participation.

26.     The Council on Environmental Quality ("CEQ") has promulgated uniform regulations to implement NEPA that are binding on all federal agencies, including the BLM. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq* (1978). The CEQ regulations were modified in 2024 ("2024 CEQ regulations"). The 2024 regulations apply to the Last Chance Project.

27.     NEPA requires all federal agencies to prepare a "detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This detailed statement, known as the Environmental Impact Statement, or EIS, must describe the environmental impacts of the proposed action and alternatives to the proposed action. *Id.* An EIS must "provide full and fair discussion of significant effects and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse effects or enhance the quality of the human environment." 40 C.F.R. § 1502.1(b).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—8

28.    In determining whether a proposed action may "significantly" impact the
environment, both the context of the action and the intensity of the effect must be considered. 40
C.F.R. § 1501.3(d). In evaluating intensity, federal agencies must consider "intensity" factors,
including the degree to which the proposed action affects public health or safety; any unique
characteristics of the geographic area; whether the action may violate relevant Federal, State,
Tribal, or local laws or other requirements or be inconsistent with Federal, State, Tribal, or local
policies designed for the protection of the environment; the degree to which the potential effects
on the human environment are highly uncertain; and the degree to which the action may
adversely affect an endangered or threatened species or its habitat, including habitat that has
been determined to be critical under the Endangered Species Act of 1973. 40 C.F.R.
§§ 1501.3(d)(2).

29.    If an agency is unsure if a federal action will have a significant effect on the
human environment, it must prepare an Environmental Assessment ("EA") to determine if an
EIS is required. 42 U.S.C. § 4336; 40 C.F.R. § 1501.5(a).

30.    After analyzing a proposed action, an agency may determine that it will have no
significant impact on the environment and decide to implement it. For an agency's decision to be
considered reasonable, a decision record and finding of no significant impact ("DR/FONSI")
must be issued containing sufficient evidence and analysis to show the decision is reasonably
supported by the facts. The agency must show a rational connection between the facts found and
the decision rendered. If the agency fails to consider important aspects of the problem in its
NEPA analysis, its decision is arbitrary and capricious.

31.    To support an agency determination of non-significance, NEPA documents must
consider the direct, indirect, and cumulative environmental impacts of a proposed action. 40

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—9

C.F.R. § 1508.1(i)(4). Direct effects are caused by the action and occur at the same time and place as the proposed project. 40 C.F.R. § 1508.1(i)(1). Indirect effects are caused by the action and are later in time or farther removed in distances but are still reasonably foreseeable. 40 C.F.R. § 1508.1(i)(2). Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]." 40 C.F.R. § 1508.1(i)(4). Cumulative effects result from "actions with individually minor but collectively significant effects taking place over a period of time." 40 C.F.R. § 1508.1(i)(3).

32.     NEPA requires that environmental information be available to public officials and citizens before agency decisions are made and before any actions occur to implement the proposed project. 40 C.F.R. § 1500.1(b). The information released must be of high quality and sufficient to allow the public to question the agency rationale and understand the agency's decision-making process. *Id.*

33.     40 C.F.R. § 1501.11(b) provides that agencies "should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided." A subsequent environmental assessment "shall concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1501.11(b)(1).

34.     An agency may rely on a programmatic environmental document in a subsequent environmental document 5 years after that document was issued "so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid. The agency shall briefly document

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—10

its reevaluation and explain why the analysis remains valid considering any new and substantial information or circumstances." 42 U.S.C. 4336b; 40 C.F.R. § 1501.11(c)(2).

35.     Courts view tiered analyses in its entirety when determining whether it adequately address all impacts and may reject such environmental review where none of the documents address significant issues. Under NEPA, an agency cannot minimize an activity's environmental impact by adopting a broad scale analysis in order to marginalize the activity's site-specific impact.

**Federal Law and Policy on Old Forests and Carbon**

36.     On April 22, 2022, President Biden issued Executive Order 14072 (EO 14072). *See* 87 Fed. Reg. 24,851 (April 22, 2022). EO 14072 directs both the Forest Service and BLM to conserve mature and old-growth forests on federal lands in part as a natural climate solution and to support biodiversity.

37.     BLM subsequently promulgated a new Conservation and Landscape Health Rule, codified at 43 C.F.R. Parts 1600 and 6100, and effective June 10, 2024. Objectives of the new rule include "[p]romoting conservation by maintaining, protecting and restoring ecosystem resilience and intact landscapes, including habitat connectivity and old-growth forests." 43 C.F.R. § 6101.2(b). Other provisions of the new rule also focus on the protection and restoration of old-growth. *See* 43 C.F.R. §§ 6101.5 (d)(3), 6102.1(a), 6102.2(c).

38.     On January 20, 2021, President Biden issued Executive Order 13990 (EO 13990). *See* 86 Fed. Reg. 7,037 (Jan. 20, 2021). EO 13990 directed federal agencies to "capture the full costs of greenhouse gas emissions as accurately as possible" when considering proposed actions and alternatives.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—11

39.    CEQ subsequently issued interim guidance for analyzing greenhouse gas emissions on January 9, 2023. *See* 88 Fed. Reg. 1,196 (Jan. 9, 2023). The interim guidance directed agencies to use available tools, including "best available social cost of [greenhouse gas] estimates," in order to "help evaluate the significant of an action's climate change effects[] and better understand the tradeoffs associated with an action and its alternatives." *Id.* at 1,198.

## FACTUAL AND ADMINISTRATIVE BACKGROUND

### The 2016 RMP

40.    The 2016 Southwestern Oregon RMP ("2016 RMP") provides overall direction for the management of all natural resources on BLM-administered lands in southwestern Oregon, including the old-growth forests at issue here, through management directions for different land use allocations. Those land use allocations include three main categories: the Harvest Land Base ("HLB") where commercial logging is the focus, and reserve allocations (Late Successional Reserves ("LSR") and Riparian Reserves ("RR") where the focus is on forest conservation and the retention of late-successional wildlife habitat, and fish habitat and water quality, respectively.

41.    Under the 2016 RMP, management directives specific to the HLB include conducting silvicultural treatments to enhance timber values and reduce fire risk; restoring and maintaining habitat for sensitive species; providing complex early-seral ecosystems; promoting the development of structural complexity; meeting snag retention and creation levels; and retaining large trees.

42.    The Riparian Reserve land use allocation has management objectives to, *inter alia*, contribute to the conservation and recovery of ESA-listed fish species and their habitats and provide for conservation of Bureau Special Status fish and other Bureau Special Status riparian-associated aquatic species; maintain and restore natural channel dynamics, processes, and the

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

proper functioning condition of riparian areas, stream channels, and wetlands by providing forest shade, sediment filtering, wood recruitment, stream bank and channel stability, water storage and release, vegetation diversity, nutrient cycling, and cool and moist microclimates; maintain water quality and streamflows within the range of natural variability, to protect aquatic biodiversity, provide quality water for contact recreation and drinking water sources; meet Oregon Department of Environmental Quality (ODEQ) water quality criteria; maintain high quality water and contribute to the restoration of degraded water quality for 303(d)-listed streams; and maintain high quality waters within ODEQ-designated Source Water Protection watersheds.

43.     The 2016 RMP contains management direction to only allow road construction, stream crossings, skid trails and yarding corridors in Riparian Reserves "where there is no operationally feasible and economically viable alternative to accomplish other resource management objectives."

44.     The BLM is required to demonstrate how any project developed under the 2016 RMP will follow relevant management directions to achieve the RMP's objectives. This includes site-specific analyses of landscape characteristics—including wildlife populations, the presence of snags and coarse down wood, stand density and conditions, tree diameter and age, invasive species infestations, extent of detrimental soil disturbance, water quality, and availability of wildlife habitat—to ensure compliance with the RMP's substantive objectives and directives.

45.     The 2016 RMP contains other wildlife management objectives including to conserve and recover species that are ESA-listed, proposed, or candidates and the ecosystems on which they depend.

//

//

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—13

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**The Last Chance Project**

46.    The BLM issued a scoping letter for the Last Chance Project on December 22, 2020. Plaintiffs submitting scoping comments on February 2, 2021.

47.    The BLM released a first draft Environmental Assessment for the Last Chance Project on July 8, 2024.

48.    On August 7, 2024, Plaintiffs submitted extensive comments on the draft EA, raising detailed concerns about, *inter alia*, logging in LSRs and riparian reserves, effects to spotted owl habitat, effects to coho salmon, Western pond turtles, and other sensitive wildlife species, wildfire risk, the need to preserve old-growth, the effects of utilizing infected rock quarries on the spread of noxious and invasive weeds, soil disturbance, and water quality.

49.    The BLM publicly posted a second draft EA and draft FONSI on August 8, 2024.

50.    The BLM issued the Final EA and FONSI on September 10, 2024.

51.    The EA describes four alternatives. Alternative 2 contemplates commercial and non-commercial forest management activities on approximately 11,686 acres of BLM-administered lands. Of those, 8,420 acres are proposed for commercial timber sale logging activities. Alternative 2 contemplates commercial logging activities on 1,297 acres of riparian reserves. Alternative 2 also contemplates 241 miles of road renovation, 28 miles of new logging road construction, and potential utilization of 14 existing rock quarries to facilitate project activities.

52.    Concurrently with the issuance of the Final EA and FONSI on September 10, 2024, the BLM issued its first Decision Record ("DR") for the "Paul's Payoff" timber sale authorizing activities pursuant to the Last Chance EA that were described under Alternative 2.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

53.     The DR authorized a total of 575 acres of commercial logging activities, 2.6 miles of road construction, 30.3 miles of road renovation, and 32.9 miles of haul roads.

54.     On October 7, 2024, Plaintiffs filed a notice of appeal and request for stay to the Interior Board of Land Appeals appealing the Last Chance Project and first DR.

55.     Plaintiffs have exhausted their required administrative participation with respect to the Last Chance timber sale.

**Mature and Old-Growth Stands**

56.     There are mature and old-growth forests and forest stands that will be logged as part of the Last Chance Project.

57.     The 2016 RMP contains no site-specific analysis of the effects of logging the mature and old-growth trees and forest stands within the Last Chance Project area.

58.     The Last Chance EA does not disclose and consider the effects of logging mature and old growth trees and forest stands within the Project Area.

59.     Upon information and belief, there are individual trees within the project area and within logging units and within proposed new road locations that are over 200 years old and/or are larger than 40 inches in diameter at breast height.

**Noxious and Invasive Weeds**

60.     The 2016 RMP contains management objectives and direction relating to noxious and invasive weeds. Specifically, the RMP directs BLM to "implement measures to prevent, detect, and rapidly control new invasive species infestations."

61.     There are noxious and invasive weeds present the Project Area. Specifically, there are 16 non-native invasive plant species within the Project Area Commercial Units, 14 non-

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

native invasive plant species within the Project Area Fuel Unit, and 9 non-native invasive plant species within the Project Area where BLM proposed road construction and renovation.

62.    Non-native invasive weeds typically outcompete native plants.

63.    In addition to spreading existing noxious and invasive weeds, Last Chance Project activities are also expected to introduce new noxious and invasive species into the Project Area.

64.    Ground disturbance caused by Last Chance project activities will increase the risk for the introduction and spread of noxious and invasive plant populations.

65.    The Project includes the use of 14 rock quarries.

66.    All of the Project's rock quarries are infested with noxious or invasive weeds.

67.    BLM has not been consistently treating the noxious and invasive weeds in the Project Area, and specifically in the existing quarries. BLM concedes that treatment on existing populations is not feasible for all populations, nor will treatment eliminate populations entirely.

68.    BLM has not and does not intend to treat the infested rock quarries before utilizing the rock from the infested rock quarries on road construction and renovation throughout the Project Area.

69.    Upon information and belief, using the rock from the infested rock quarries will result in new invasive infestations throughout the Project Area.

70.    BLM may not have funding or staff to treat the noxious weeds and invasive species in the Project area, including new infestations resulting from the Project activities.

71.    The Last Chance EA does not adequately analyze the site-specific effects of the Project on the spread of noxious and invasive weeds.

_//_

_//_

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—16

**Bureau Sensitive Species**

72.     The 2016 RMP has management direction that is intended to address threats to Bureau Sensitive Species and their habitat. For example, the 2016 RMP directs BLM to "implement conservation measures that reduce or eliminate threats to Bureau Sensitive Species."

73.     Western Pond Turtle ("WPT") is a Bureau Sensitive Species.

74.     Upon information and belief, BLM has not gathered, provided or analyzed population or reproductive data about WPT within the Project Area.

75.     Upon information and belief, BLM does not know if there are WPTs in the Project Area, or if it does know, it did not disclose that information in the Project documents.

76.     The WPT is a candidate for listing under the Endangered Species Act. On October, 3, 2023, federal biologists in the United States Fish and Wildlife Service published a proposed rule detailing the need for listing the WPT as threatened with extirpation or extinction.

77.     WPTs are semi-aquatic; they require aquatic and terrestrial (upland) habitats that are connected to one another or within close proximity. Upland habitats are used for both nesting and overwintering.

78.     WPTs occur in a broad range of permanent and ephemeral water bodies including rivers and streams, lakes, natural and constructed ponds, wetlands, marshes, vernal pools, and reservoirs. WPTs use aquatic habitat for breeding, feeding, overwintering and sheltering.

79.     WPTs use upland habitat for nesting and overwintering. Female WPTs require upland nesting habitat in order to lay their eggs.

80.     WPT upland habitat must be in close proximity to the aquatic habitat used by the species.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—17

81.    WPT upland overwintering habitat includes areas above the high-water elevation of aquatic habitat up to approximately 1,640 ft from aquatic habitat.

82.    Upland overwintering habitat is generally forested areas that have closed canopies and leaf litter.

83.    For the Last Chance Project, BLM considered all areas that qualify as NSO NRF and dispersal habitat as analogs for WPT upland overwintering habitat.

84.    The Last Chance Project, through the vegetation management, road construction and reconstruction, haul route construction, and quarrying activities will result in a loss of overwintering habitat because there would be a loss of canopy cover.

85.    The EA acknowledges that the Last Chance project activities will modify nearly half of the WPT upland overwintering habitat in the Project Area, including removal of at least 736 acres, while the actual amount could be more. BLM did not consider or analyze road reconstruction or road renovation as contributing to the loss or modification of WPT habitat.

86.    The U.S. Fish and Wildlife Service ("FWS") has concluded that WPTs will be limited in their ability to maintain populations in the wild in the next 50 to 75 years; therefore, the WPT is likely to become in danger of extinction within the foreseeable future throughout all of its range.

87.    An appendix to the Last Chance EA indicates that the BLM may waive all protections and mitigations (to the extent any are in effect) for the WPT that are contemplated the agency's effects analysis if it is not listed under the ESA.

//

//

//

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—18

**ESA-Listed Fish Species**

88.     The Project area contains habitat for Oregon Coast (OC) coho Salmon and Southern Oregon/Northern California (SONCC) coho Salmon. OC coho salmon and SONCC coho salmon area each currently listed as threatened under the Endangered Species Act.

89.     The Project Area also contains designated critical habitat for SONCC coho salmon and OC coho salmon.

90.     Streams and habitat currently or historically accessible to coho salmon are considered Essential Fish Habitat ("EFH"), designated for fish species of commercial importance by the Magnuson-Stevens Fishery Conservation and Management Act of 1996 50 CFR, Part 600, Subsection J, EFH.

91.     Multiple Last Chance project activities will negatively affect both OC and SONCC coho salmon and their habitat, including but not limited to logging, yarding, landing establishment and road construction in Riparian Reserves, watersheds, sub-watersheds, and catchments, timber hauling, and road-related activities such as renovation, construction, decommissioning, and stream crossing renovation.

92.     These activities will affect sedimentation, water quantity (peak and low flows), and water quality (including temperature), which will, in turn, affect fish and fish habitat.

93.     For example, road renovation and construction will cause erosion and increased sedimentation to streams in the Project Area.

94.     Last Chance haul road segments and road-related activities directly intersect 27 stream segments containing salmon critical habitat and EFH. There are also 52 miles of roads proposed for renovation that are located within 200 feet of a stream.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—19

95.    The Last Chance EA fails to demonstrate how BLM determined that conducting the Last Chance activities in the Riparian Reserves, including but not limited to stream crossings for timber hauling and road construction and renovation, were the only operationally feasible and economically viable means to accomplish resource management objectives.

**Northern Spotted Owls**

96.    The northern spotted owl (*Strix occidentalis caurina*) ("NSO") is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. The NSO occupies late-successional and old-growth forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County, including the Last Chance Project Area.

97.    Spotted owls rely on older, mature and complex forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

98.    Due to concerns over widespread habitat loss and modification as well as the lack of regulatory mechanisms to protect the species, the FWS listed the NSO as "threatened" under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); *Determination of*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

*Threatened Status for the Northern Spotted* Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)).

99.     Critical habitat was designated for the species in 1992 and revised in 2008, 2012 and 2021.

100.     The 2012 critical habitat rule states that "primary constituent elements" of NSO critical nesting and roosting habitat

> typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly.

77 Fed. Reg. 71,876, 71,905 (Dec. 4, 2012).

101.     In Southern Oregon, NSO nesting and roosting habitat consists of conifer stands with a multi-layered, multi-species canopy dominated by larger conifer overstory trees, canopy cover ≥ 60 percent, overstory tree diameter of ≥ 21" diameter at breast height (dbh), > 12 trees with 20" or greater dbh trees/acre, quadratic mean diameter ("QMD") > 15" dbh, basal area from 180 to 240 $ft^3$/acre (most often greater than 240 $ft^3$/acre), and a basal area from larger trees of > 30$ft^3$ for trees > 26" dbh.

102.     Sixty percent canopy cover is the "minimum canopy cover requirement" for NRF habitat.

103.     The Medford District of the BLM is within the range of the NSO.

104.     There are occupied NSO activity centers within the Last Chance Project Area.

105.     There are also NSO activity centers in which NSOs were detected as recently as 2020 but which BLM considers to be unoccupied.

106.     The Last Chance Project will remove or downgrade 3,662 acres of NRF habitat.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—21

107.    Upon information and belief, the Last Chance Project will affect over 7,000 acres of NSO designated critical habitat, including removing 2,137 acres of NRF critical habitat.

108.    Where the NRF is being removed, it will not recover to the point of being functional NRF habitat again for over 100 years.

109.    Upon information and belief, many of the previously occupied NSO activity centers will no longer function as NSO habitat and will not be able to be occupied following implementation of the Last Chance Project activities.

**Wildfire Hazard and Risk**

110.    The Project's logging activities, including variable retention harvest ("VRH") and commercial thinning with up to four-acre "gaps," which will result in small-diameter conifer stands and an increase in brush and understory fuels, will increase fire hazard, rather than reduce it.

111.    Commercial thinning with four-acre gaps and VRH associated with the Project will replace more diverse species and forest composition with single-aged, less diverse forests.

112.    The replacement of older mature forest stands with new plantations and/or young second-growth conifers will increase the overall fire hazard of the logging units for decades.

113.    Proposed treatments, including commercial thinning with the creation of up to four-acre gaps, will substantially increase wind speeds.

114.    Proposed treatments will shift the forest structural stage, decreasing resistance and increasing fire hazard for 30 to 50 years.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—22

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

115.    Specifically, after Last Chance logging occurs, the remaining stand establishment stage forests and the replanted areas will persist as a high fire hazard until they regain and redevelop mature features and age classes of 50 to 80 years post-treatment.

**Carbon Storage and Greenhouse Gas Emissions**

116.    The Last Chance Project EA does not evaluate or disclose the Project's site-specific impacts on carbon storage or greenhouse gas emissions despite the direction of EO 13990 and available tools to do so, but instead relies solely on the broad programmatic analysis of carbon storage and greenhouse gas emissions contained in the 2016 RMP FEIS covering 2.5 million acres of Western Oregon BLM lands.

117.    The Last Chance Project will remove as much as 117 million board feet of timber from the Project Area, from trees that currently store tons of carbon from the atmosphere and will continue to store additional carbon into the future if left living. The Project EA does not evaluate or disclose the amount of carbon storage that will be lost due to logging or other tree removal under the Project, or the amount of time it will take for future tree growth to store the amount of carbon removed as a result of the Project.

**Cumulative Effects**

118.    The Last Chance Project Area is directly adjacent to the 2018 Poor Windy Project area to the west and northwest and by the 2016 Upper Cow Project area to the north. The eastern edge of the Last Chance project area is bordered by the 2018 Grave Creek Fire of the Garner Complex wildfire and the BLM Butte Falls Field Office boundary.

119.    Implementation of the Poor Windy Project, which is ongoing, and other projects in the vicinity have affected and will affect forest conditions, fire regimes, carbon storage, northern spotted owls, listed fish and their habitat, hydrology and sedimentation, Bureau

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Sensitive Species, and the spread of invasive and noxious weeds in the same area of BLM lands as the Last Chance Project.

120.    The Last Chance Project and the Poor Windy Project, along with other projects and activities in the vicinity have combined and synergistic effects on forest conditions, fire regimes, carbon storage, northern spotted owls, listed fish and their habitat, hydrology and sedimentation, Bureau Sensitive Species, and the spread of invasive and noxious weeds in the same area of BLM lands as the Last Chance project.

121.    BLM did not adequately analyze these combined and synergistic effects in the Last Chance EA.

122.    The Last Chance EA indicates that despite alleged project goals other than timber production, the proposed action "maximizes the commercial harvest acres treated and maximizes the intensity of the treatment."

## FIRST CLAIM FOR RELIEF
### (FLPMA and APA Compliance)

**Count 1: Failure to demonstrate and ensure consistency with the RMP directive regarding reducing fire risk in the HLB.**

123.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

124.    The 2016 RMP directs the BLM to conduct logging activities in the HLB "to reduce fire risks."

125.    The logging activities approved in the EA, FONSI and DR will not reduce fire risks, but will instead increase them.

126.    BLM has failed to adequately demonstrate how the Last Chance Project is consistent with management direction "to reduce fire risks" in the HLB.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—24

127.     BLM's failure to demonstrate how the Project is consistent with this RMP management direction violates FLPMA and is arbitrary, capricious, an abuse of discretion, and not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 2: Failure to explain and ensure consistency with the RMP directive regarding road construction and stream crossings in Riparian Reserves.**

128.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

129.     The 2016 RMP directs BLM to "allow yarding corridors, skid trails, road construction, stream crossings, and road maintenance and improvement [in Riparian Reserves] where there is no operationally feasible and economically viable alternative to accomplish other resource management objectives."

130.     BLM will be conducting yarding, skidding, road construction, stream crossings, and road maintenance and improvement" in Riparian Reserves as part of the Last Chance Project, but it never demonstrated that there are no operationally feasible and economically viable alternatives.

131.     BLM has failed to adequately demonstrate how the Last Chance Project is consistent with this management direction.

132.     BLM's failure to demonstrate how the Project is consistent with this RMP management direction violates FLPMA and is arbitrary, capricious, an abuse of discretion, and not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 3: Failure to explain and ensure consistency with the RMP directive regarding preventing, detecting and rapidly controlling new invasive species infestations.**

133.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

134.     The 2016 RMP directs BLM to "implement measures to prevent, detect, and rapidly control new invasive species infestations."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—25

135.    The Last Chance Project will result in new invasive species infestations in the Project Area.

136.    BLM has failed to adequately demonstrate how the Last Chance Project is consistent with this management direction.

137.    BLM's failure to demonstrate how the Project is consistent with this RMP directive violates FLPMA and is arbitrary, capricious, an abuse of discretion, and not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2)

**SECOND CLAIM FOR RELIEF**
**(NEPA and APA Compliance)**

138.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

139.    NEPA and its implementing regulations require federal agencies to take a hard look at the environmental consequences of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment. *See* 42 U.S.C. § 4332(C)(iii); 40 C.F.R. § 1501.

**Count 1:        Failure to Take a Hard Look at Site-Specific Impacts**

140.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

141.    Federal agencies are required to disclose and analyze the direct, indirect, and cumulative effects of proposed actions on the environment. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.1(i)(4).

142.    The impacts analysis in an EA must be site-specific because in order to determine the significance of an action, the agency must consider the characteristics of the geographic area, including the local context. 40 C.F.R. § 1501.3(d)(1).

143.    NEPA allows agencies to tier their analyses to a previous NEPA document (generally, a programmatic assessment) to eliminate repetitive discussions and concentrate on the

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

issues specific to the proposed action. 40 C.F.R. § 1501.11(b). The agency must conduct a site-specific and project-specific analysis in the subsequent NEPA document. 40 C.F.R. § 1501.11(b)(1).

144.    An agency may rely on a programmatic environmental document in a subsequent environmental document 5 years after that document was issued "so long as the agency reevaluates the analysis in the programmatic environmental document and any underlying assumption to ensure reliance on the analysis remains valid. The agency shall briefly document its reevaluation and explain why the analysis remains valid considering any new and substantial information or circumstances." 42 U.S.C. 4336b; 40 C.F.R. § 1501.11(c)(2).

145.    The BLM failed to conduct site-specific analyses of, or disclose the potential impacts to, a number of issues in the Last Chance Project EA. Specifically, the BLM failed to take a hard look at the project's effect to other special status wildlife species and their habitat, including northern spotted owls, coho salmon, and Western pond turtles; mature and old-growth forest stands; invasive species; road density and roads in riparian reserves; or carbon storage, greenhouse gas emissions, and climate change, amongst other resource issues. It therefore failed to take a sufficiently hard look at the Project's impacts.

146.    Instead, with respect to several resource impacts, the BLM improperly tiered the Last Chance EA to the 2016 RMP and programmatic FEIS. Such tiering was insufficient to meet the BLM's NEPA obligations here.

147.    The programmatic RMP FEIS contains no site-specific analysis of special status wildlife species and their habitat; invasive species; wildfire risk; road density; or carbon storage, greenhouse gas emissions, and climate change within the Last Chance Project Area. The programmatic FEIS itself repeatedly states that it contains no such analysis or data. The

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—27

programmatic FEIS states that future implementing decisions should contain this site-specific

analysis and data. The programmatic FEIS provides a broad-scale description of 2.5 million

acres and two separate resource management plans; it does not contain the level of analysis to

properly draw conclusions regarding the significance of impacts the Last Chance Project could

have. The BLM has not reevaluated the analysis and assumptions in the programmatic FEIS and

ensured that those analyses and assumptions remain valid.

148.    The BLM's failure to take the requisite hard look at the Project's direct, indirect,

and cumulative effects, failure to reevaluate its previous analysis to ensure continued validity,

and failure to make a reasoned determination of non-significance violates NEPA and its

implementing regulations, and is arbitrary, capricious, an abuse of discretion, and not in

accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count 2:**     **Failure to Take a Hard Look at Cumulative Impacts**

149.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

150.    NEPA requires federal agencies to take a hard look at the cumulative

environmental impacts of proposed actions. When analyzing cumulative effects, an agency must

analyze the effects on the environment resulting from the incremental impacts of the action when

added to other past, present, and reasonably foreseeable future actions. 40 C.F.R.§ 1508.1(i)(3).

151.    The Last Chance Project will have significant cumulative impacts, which the

BLM did not analyze or disclose in the EA, FONSI, and DR.

152.    The BLM performed no cumulative impacts analysis at all for the majority of the

issues identified in the EA.

153.    As to the limited discussion of cumulative impacts that the BLM did undertake, it

was wholly inadequate because it failed to consider, analyze, and disclose the foreseeable

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

cumulative impacts of the Poor Windy Project and other projects, which together authorize

nearly 30,000 acres of commercial logging, in overlapping project areas, over the same period of

time, across much of the Grants Pass Field Office area and surrounding watersheds. These

multiple projects will have potentially significant impacts on, *inter alia*, ESA-listed and other

special status wildlife species and their habitat, sedimentation, hydrology, road density, soil

disturbance, invasive species spread, mature and old-growth forest stands, carbon storage and

greenhouse gas emissions, and wildfire hazard and risk.

154.    The BLM also failed to adequately consider the cumulative impacts of the Last

Chance Project in the context of past actions in the Grants Pass Field Office and on surrounding

private lands.

155.    The BLM's failure to take the requisite hard look at the cumulative effects the

Last Chance Project when added to other past, present, and reasonably foreseeable future actions,

violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of

discretion, and not in accordance with and without observance of procedure required by law. 5

U.S.C. § 706(2).

**Count 3:        Failure to Prepare an Environmental Impact Statement.**

156.    KS Wild realleges and incorporates by reference all preceding paragraphs.

157.    Federal agencies are required to prepare an EIS when there is a risk that a major

federal action will "significantly affect[] the quality of the human environment." 42 U.S.C.

§ 4332(C).

158.    An agency's decision not to prepare an EIS must be fully-informed and well-

considered, supported by a convincing statement of reasons why the action's effects will not be

significant.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—29

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

159.    In deciding whether an action may have a significant impact, the agency must consider the context and intensity of the proposed project. 40 C.F.R. § 1501.3(d). CEQ regulations specify factors the agency must consider when assessing a project's intensity. *Id.*

160.    The significance of one individual factor, or of multiple factors in combination, may require preparation of an EIS.

161.    The Last Chance Project will have intense effects and implicates numerous intensity factors that individually and cumulatively compel the preparation of an EIS. The BLM therefore acted arbitrarily and capriciously in releasing a FONSI and failing to prepare an EIS.

162.    The Last Chance Project will affect areas with unique characteristics, including mature and old-growth forests, critical habitat for ESA-listed species and other special status wildlife species, and riparian reserves.

163.    The Last Chance Project will result in effects that are highly uncertain, including the impact of logging on mature and old-growth forest stands, carbon storage and greenhouse gas emissions, northern spotted owl habitat, coho salmon habitat, water quality, fire hazard and risk, and forest resiliency to climate change.

164.    The Last Chance Project is likely to adversely affect ESA-listed species, specifically northern spotted owls and coho salmon, and designated critical habitat for these species.

165.    The Last Chance Project may violate relevant Federal, State, Tribal, or local laws or other requirements or be inconsistent with Federal, State, Tribal, or local policies designed for the protection of the environment. The BLM has not explained how the Project will conform to the 2016 RMP and its substantive standards. The BLM has not shown it can implement the Project in conformance with RMP direction to reduce fire risks within the HLB, RMP direction

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

to limit yarding corridors, skid trails, road construction, stream crossings, and road maintenance and improvement in Riparian Reserves except where there is no operationally feasible and economically viable alternative to accomplish other resource management objectives; and to prevent new invasive species infestations. The BLM has also failed to demonstrate how the Last Chance Project is consistent with Executive Orders 13990 and 14072 and the BLM's own Conservation and Landscape Health Rule.

166.    The Last Chance Project will cause significant and cumulative effects within the Project's regional context, as Project activities will occur over the course of multiple decades, on over 11,000 acres intermixed with lands under private, state, and federal management, most of which are likely to be commercially logged in the coming decades. Specifically, the BLM's Poor Windy Project authorizes commercial logging directly adjacent to the Last Chance Project Area, including in spotted owl activity centers and effecting similar resources. The cumulative environmental effect of implementing both projects, and others, is significant for purposes of NEPA.

167.    The intensity factors implicated by the Last Chance Project are significant individually and when considered cumulatively.

168.    The BLM's decision to authorize the Last Chance Project without first preparing an EIS violates NEPA and its implementing regulations, and is arbitrary, capricious, an abuse of discretion, not in accordance with and without observance of procedure required by law. 5 U.S.C. § 706(2).

### <u>REQUEST FOR RELIEF</u>

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—31

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

1.      Declare the BLM's issuance of the Last Chance Environmental Assessment, Finding of No Significant Impact, and any and all associated Decision Records arbitrary, capricious, an abuse of discretion, and contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

2.      Declare that the BLM's issuance of the Last Chance Environmental Assessment, Finding of No Significant Impact, and any and all associated Decision Records violate FLPMA.

3.      Declare that the BLM violated the National Environmental Policy Act and its implementing regulations by approving the Last Chance Project without taking a "hard look" at site-specific impacts and/or preparing an EIS;

4.      Vacate and set aside the EA, FONSI, and any and all associated DRs for the Last Chance Project, and order the BLM to withdraw any decisions or contracts made pursuant to the Paul's Payoff Decision Record until such time as the BLM demonstrates that it has complied with the law;

5.      Enjoin the BLM and its contractors, assigns, and other agents from proceeding with implementing the Last Chance Project until such time as the BLM demonstrates that it has complied with the law;

6.      Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be subsequently requested by Plaintiffs;

7.      Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

8.      Grant such further relief as the Court deems just, proper, and equitable.

//

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—32

Respectfully submitted and dated this 19th day of November, 2024.

/s/ Meriel L. Darzen
Meriel L. Darzen, OSB # 113645
503-525-2725 meriel@crag.org
Oliver J. H. Stiefel, OSB # 135436
503-227-2212 │ oliver@crag.org
Crag Law Center
3141 E. Burnside St.
Portland, Oregon 97214

*Attorneys for Plaintiffs*